for sticking with us through all the juggling that we've had to go through to have this matter scheduled. Mr. Travis, are you ready to proceed? I am, Your Honor. Okay. May it please the Court, Mr. Martin. My name is Ron Travis, and I represent the appellant, Richard Stubler. You're not arguing, as far as I can see, you're not arguing for us to review the reasonableness of the sentence, or arguing the sentence was unreasonable under Booker review. You're not making that argument. You've kind of centered around the premises of what your arguments seem to be, but you're not actually arguing the reasonableness of the sentence, as far as I can recall. Correct. The issue, the sentencing issues relate to the manner in which the first step of the process was undertaken by the Court. Your Honor, I did want to point out that I would like to reserve two minutes. Okay. Of my time. With respect to the appeal we have filed, we have filed an appeal that raises three issues with respect to the calculation of the sentence, but we've also raised a sufficiency of evidence issue. I'm going to start with the sufficiency of the evidence issue. We're successful on that issue. All the sentencing issues become. We have to worry about this. We understand that because of the sufficiency issue that we've raised, that we have to deal with the concept that all of the evidence has to be taken in a light most favorable to the government, and also we have to deal with the standard, which is particularly deferential. We submit to the Court that based upon the record, which is in front of the Court, and the information was in front of the trial judge, that there's an insufficient basis to find a violation of Section 115A.2. A couple of important, undisputed facts. Richard Stubler was under a term of supervised release. That term of supervised release ran from April of 1994 through April of 1997. The period of time he was on supervised release, he was supervised by a probation officer, Mel Hoover. The third point is that during that three-year term of supervised release, and this was a stipulation that can be found in the record at 44A, nothing occurred that would cause Mr. Stubler to want to retaliate against Mr. Hoover. Obviously, what happened here and the problems all arise after he successfully completed the supervised release and the mental and psychological problems he was having with the surveillance that he thought was happening to him. Why couldn't, given our level of review here, why shouldn't we view this evidence as establishing beyond a reasonable doubt that you're intended to communicate a threat or, because I'm looking at the statute now, a threat is not, the way I'm using it, it's not part of 115A, it's threatens to assault, or the intent to retaliate for his failure, his being Mr. Hoover's failure, to do something about the surveillance, to report it to his superiors, to take some action to stop the surveillance, and why shouldn't we assume that the government proved that this was an intent to get even with Hoover for not helping your client? That's exactly what the trial judge found, and although I don't agree with what he found, the problem with the analysis is that there were no official duties which would cover that situation. Before you go on, you said there's certain undisputed things. Are you saying that he was acting in his personal capacity? After the term of supervised release ended in April of 1997, if you look at the relationship that went on between Mr. Hoover and Mr. Stubler, I can't see how it is anything other than a personal relationship. When your friend points out that all the contacts happened at the Federal Building, during business hours, I mean, how can that be personal capacity? The contacts were by telephone and in person. You have to look at the contacts. What did the contacts consist of? What the contacts consisted of on some of the occasions were that Mr. Stubler brought to Mr. Hoover gifts, and he gave to Mr. Hoover gifts. He gave Mr. Hoover books. He gave Mr. Hoover a T-shirt. He went into his pocket, spent $180 to frame two poems, one for Mr. Hoover to have at his office, one for him to have at his home. Some of the correspondence that he exchanged, handwritten notes, Mr. Stubler referring to Mr. Hoover as Mel. Mr. Hoover referring to Mr. Stubler as Dick, including in his correspondence, say hello to your father for me. I agree. He seems pretty compassionate, which probably is a good thing. I don't disagree that the approach that was taken, given the mental condition of my client, was a right and proper thing to do. In essence, to humor him. Well, he encouraged him to take his meds and all that. Yes, he did do that. And the fact that he did only encourage him shows us that it wasn't an official relationship. It wasn't an official capacity, because if he had official duties, if he had official capacity, instead of saying, I better call his mother or his father and say, you know, check on him, or suggesting to him, maybe you need to get your meds adjusted, or maybe you need to go and talk to your mental health counselor or whoever, he would have forced him to do that. Well, how do you view the fact that he got permission from his supervisor to continue making these contacts? Again, the supervisor obviously has the authority to allow him to do that. I don't think the fact that the supervisor allowed him to do that serves to transform these contacts into an official duty. Again, there's notes or reports that Mr. Hoover created. He doesn't refer to Mr. Stubler in any present way. He talks about former client, former person under supervision, former, everything is former. You're not arguing, and neither side is really getting to the issue of whether or not there's a subjective or objective intent that's required under 115A. The intent to threaten or to retaliate, is that a threat that the law requires must be subjectively proven? In other words, if your client, if the evidence would show that your client thought that the act of putting the knife in the guy's house would be interpreted as a threat, that's one scenario. The other scenario is, even though your client may not have intended it as a threat, if the reasonable observer walking by would have interpreted that as a threat. So we get to an objective test. And you make it two different results here, depending on whether it's subjective or objective. We would say it's a subjective test. Why don't you use it that way? Because if he happened to have just found the knife on the ground, that's one thing. But he's traveling across the city, apparently, with the knife concealed up his sleeve, which may be the only rational thing that he did. He concealed the weapon that was involved in the crime. Concealing it makes some sense. Nothing else did make any sense. Well, it makes sense if you step back and take a look at what was bouncing around Mr. Suber's mind at that point in time. He believes that he saw the appearance of Osama bin Laden. He believes that that appearance was a message that Osama bin Laden was dead. Part of the Hoover reports talks about Mr. Stubler's fear that people will know that he got this message and he may get gunned down for being kind of the middle man. So that what's bouncing around Mr. Stubler's head is when he ventures out in public, he needs to have some sort of protection with him. I believe that's a logical inference as to why he had the knife. When he gets there and he is frustrated, and he's frustrated because no one answers the door, as he says, he just snapped, stuck the knife, walked back to his car, got in the car, and drove away. We challenged whether the knife sticking was properly determined to be a retaliatory conduct. The judge said, sorry, you lose that. It was retaliatory conduct. But subjectively, in the mind of Mr. Stubler, I don't believe that he thought that it would be perceived as a threat. He goes on and... He wasn't perceived as an act of kindness, we can assume. Can we not? I would agree with that. I'm not sure that really Mr. Stubler went beyond the immediate snap, reaction, stab, boom, get in the car, other than writing it down at a later point in time. I don't really think that he tried to analyze it and think it through. We can't get inside his mind. Let me ask you a more general question, Mr. Travis. You would agree with me, I assume, that this statute is intended to protect federal law enforcement officers. I certainly do. As I understand your response to Judge Chigares' question, what you're saying here Mr. Hoover should have done is that once the official period of supervision ended, when Mr. Stubler contacted Mr. Hoover, Mr. Hoover should have just shut him down, ignored him, and not talked to him. I don't necessarily go that far. I understand that there was some sort of relationship during this three-year period that at least on the part of Mr. Stubler led him to believe that Mr. Hoover was his friend. He's his probation officer. He's there to keep him out of trouble, to help him as part of the rehabilitative process. Let me get to the end point of my concern. Here's my concern. If we adopt your position, Mr. Travis, it seems to me that we may be doing the inverse of what should happen for this reason. If these federal officers are not protected by the statute, if they respond to the inquiries of the Richard Stublers of the world, then we're sending a message to them that they need to just cut these people off right away. Don't talk to them. Have no contact with them. If you have any contact with them at all, after the supervision ends, you do so at your peril. Isn't that going to wreak havoc on the system? If it's a successful period of supervised release, then one can assume that there is a professional rapport established between the supervised person and the probation officer. Wouldn't we be encouraging a really terrible situation? It's been nice knowing you, Bob. I've worked with you for five years. You're doing great, but don't ever talk to me again. I understand what you're saying. I don't personally necessarily disagree that it probably was a good thing that Mr. Stubler had Mr. Hoover in the picture, that he could bounce things off of. The problem I have is that to make this conduct, which occurred eight and a half years after the supervised release term ended, and clearly, if you look at 18 U.S.C. section 3603, you can't find any of the ten enumerated duties that Congress said probation officers have, that this falls within the parameters of. Is that an exhaustive list? Yes. If you look at the list, if you look at factors one through duties one through four and seven, all require someone to either be on probation or under supervised release. Duty five deals with record keeping. Duty nine deals with ability to carry a firearm. Duty six requires the attorney general to ask you to do something for someone who is on work release or released from custody. And duty eight and duty ten require specific direction or designation by the court. You're taking a pretty strict view of this. I mean, don't the cases counsel us that these job descriptions really, they don't provide the only answer for us? I mean, Hoy says that. For then folks, you know, student attorneys like yourself will be able to point out, not that you are doing this now, but, you know, technicality, well, it doesn't quite fit here, so therefore, the guy walks. You know, is that right? No. But, again, I don't disagree with your position, but you have to look at Hoy. And when you look at the facts of Hoy and the basis for the decision, there was an officially adopted policy that allowed that non-duty contact. Okay? And Reimer, I think, is the other one, or the one involving the U.S. Marshals. I forget if it's Reimer or Reid, maybe. Officially adopted policies of that agency. One, U.S. Marshals Service. One, DEA. They say when you're off duty, you can respond to these things. All I'm saying to you is Congress has said these are the duties a probation officer has. If there is going to be some spillover after supervised release is done, and they want to do it by some sort of policy, I don't have any problem with that. But we don't have that here. And so we take a statute and we're catching someone in the net that I don't believe the way the statute is written when you look at Section 3603. But Mr. Stubler was intended to be caught in that net. I'm saying that the district court basically amended 115A to insert something like the phrase that the accused believes to be in the performance of official duties, rather than as actually in the performance of it. And had Congress intended that interpretation, they would have included in that subjective belief, which might actually be a better statute, because that way you eliminate the mistake. If someone retaliates against someone for doing something that the person believes to be part of their official duties and they're wrong, then they should be protected, arguably. And Congress should have thought about that and probably intended that when they wrote the statute. But you're saying that's not the way they drafted it. I would agree that if I were in Congress, that would be an appropriate way to amend it, to expand the scope of those who are to receive protection under the Act, rather than having courts do that. Well, you realize, Ben, for a while we haven't even gotten into your much more intricate arguments, your guidelines. Let me ask, given Greene and Parsons, why don't you lose? Whether or not those cases were correctly decided were truly bound by them as you recognize. Why don't you lose on those arguments? With respect to Greene, I probably do lose based on Greene, because Greene dealt with 115A, I think, 1. And what I was trying to do was say to the panel, this is a different subsection. This is A2. You have to decide whether Greene applies. I raise that because I guess it's my old age, my mental infirmity. I have a difficult time understanding if Mr. Hoover has to be a probation officer for my client to be convicted of violation of Section 115, how we can take that same fact, that employment status, and then bump them six offense levels because guess what? Mr. Hoover was a federal probation officer. Well, that's the result of an overt, and I'm sure that everybody, both my clients would disagree with me, but when I read that, I said this is an exact example of what we get with these overt technical application of guidelines that are supposed to be advisory but are not advisory because everyone's conditioned to rely upon them to the exclusion of common sense. So you take a very technically correct application of the guidelines, apply it in a manner which is, I think, technically correct, but under Greene it's certainly legally correct, and you get the result which, at least to my humble way of thinking, I'm sure to the majority of you, doesn't make any sense because absent of federal status, he wouldn't have been convicted, as you're saying, so then why elevate the sentence based upon his federal status? But under the guidelines, that's exactly what you do. I understand that. The guidelines are displaced, rationed, and fought. Judges don't have to think anymore. They apply the guidelines. And with respect to Parsons, the reason I don't think we lose on Parsons is because the language of the Delaware reckless endangerment statute versus the language of the Pennsylvania reckless endangerment statute. Under the guidelines, section 4B, 1.2, to be a crime of violence, serious potential risk of physical injury to another. Under the Delaware reckless endangerment statute, substantial risk of death to another. How is that different? Pennsylvania says... But I'm talking about 4B, 1.2, which is the federal sentencing definition. And the reasons the Parsons panel found the Delaware reckless endangerment to be a crime of violence is because, as you have just observed, there's basically no difference.  In Pennsylvania, to constitute the offense of reckless endangerment, it's places or may place someone in danger. No requirement of a serious potential. No requirement of a substantial risk. The remotest possibility, because of the word may, in my view, means that Pennsylvania reckless endangerment is not a crime of violence. If it were just may place a person in danger, it would be a weird statute because it would criminalize negligence. But you kind of recklessly engage in bad conduct, which may place the person in danger of death, a serious potential injury. I would love to see a difference between this case and Parsons. But I do not see any difference except for a really hyper-technical distinction that doesn't have any difference that I can see between Delaware's recklessly endangering in the first degree and Pennsylvania's recklessly endangering under 2705. There's a few words that are different, but I sure don't see a substantive difference there. The only difference I could come up with is that in Pennsylvania it's may, which means it doesn't have to be something that there's even a good possibility would lead to someone suffering injury or death. Whereas under the guideline there has to be a serious potential risk, and under Parsons there has to be a substantial risk. I see a difference in conduct based on that language. I understand you disagree, and I guess your interpretation is more important than mine. If there are any other questions, if not, I thank you for your time. Okay, thank you. Mr. Martin? Good morning, Your Honor. May it please the court, Mr. Travis. I'm Fred Martin with the U.S. Attorney's Office, and I thank the court. Your Honor, let me ask this. Why, other than maybe this is the answer to the question, the fact that Mr. Hoover is a federal auditor, why in the world did this thing end up in the criminal justice system, especially the federal criminal justice system? The problem here is obvious, I think, to everybody. The guy's out of his medication, so he ends up with a three-year sentence in prison because he didn't take his pills when he won. That's what this case boils down to, doesn't it? We're not sure whether he was taking his medications back in September of 2005 or in June of 2006 when he continued to pose a danger to the community and to the federal building in Williamsport. Quite frankly, if Mr. Stubler had taken his medications or behaved after the incident involving the knife-sticking, no one would have been the wiser. He would have never appeared before the criminal justice system. But by circumstances in June of 2006, he basically created his own problems by coming back to the federal building, making threats that he was going to again smash. Most folks who have this kind of degree of mental impairment do create their own problems. As someone said, I think it was the judge or maybe the AUSA, that he's more of a danger to himself than he is to anyone else. I think that's a shared belief, Your Honor. I asked Mr. Travis specifically whether or not the reasonableness of the sentence was being appealed. It's not. So that's probably not here or there. Let me ask you this. If he had exactly the same scenario in terms of his relationship with his probation officer, but forget about the knife, for instance, for example. Let's assume that he gave his poem to his probation officer under the same scenario. The probation officer got afraid and wanted to go back to Mr. Stubler to show him how nice it looked in a frame. He runs a red light in the process, runs into a modus. The modus is the federal government. It argues that the probation officer, Mr. Hoover, while he was taking this framed poem back to Mr. Stubler, was acting within the scope of his employment as a probation officer, and therefore the federal government was liable. Forget the issue of sovereign immunity for a second. I cannot imagine that any court would find that he was acting within the scope of his employment for civil tort and liability purposes. Again, that's a different circumstance. Why is it different? Why, if he's not within the scope of his authority there, if he's taking a poem as opposed to meeting with him in a regular case, if that's not within the scope of authority, how is this scenario, where it's not really anything they specifically did that resulted in this, how is this within the scope of his authority under 115? Again, I think it's a totality of the circumstances that you would have to examine, and in the example of the returning of the poem and running the red light, we have that one factor here. We have far more factors here. But what's different here? In my example, at least he's doing something affirmatively. The most important... Part of the federal relationship here, he's not even doing that. The most important thing, I think, is the approval of the chief U.S. probation officer. And I think whether this court, any of the judges here, for example, would go to see a Phillies game with some judges from Fiji, they might want to check with the chief judge to make sure that is within the scope of their activities, for example. Once you have the approval... How many of you weren't going to pay for yourselves? I actually tried to send some books to the chief justice of Ghana, and I was told I had to pay for that myself. It was $115, and I ended up not sending the books. I didn't want to irritate any court relations, but that's, again, everyone has someone over whom everyone has a supervisor. In this case, Mr. Hoover was... And that, I think, is the most important thing, is that he received the approval of his probation officer. Received approval to do what? To continue to have contacts with Mr. Stubler in the federal building, on federal time, on the clock, so that the location... That's really the question. He's on the clock. That's what it boils down to. That's part of it. Theoretically, if, for example, Mr. Hoover had an affair, and Mr. Stubler I don't think is married, but if Mr. Stubler had an affair with Mrs. Stubler in the federal building while on the clock, I don't think we would have him acting in his official capacity, and we certainly wouldn't have retaliation based upon an official duty. Rather, it would be definitely a personal matter. Mr. Martin, we have to have you argue more often. You take a relatively interesting but fairly mundane case and really pump it up and make it interesting with your hypotheticals. I'm going to have to have you back on a trademark infringement case. See if you can make that interesting. I'll see you again with the hammer case, Judge. Are you on that? Again, I was going to open my remarks by saying, on the whole, I'd rather be in Philadelphia than on the operating table any day. So, again, I thank the court for allowing Mr. Travis and I to come down at a later time. But, again, I think you have to consider that he was on the clock. In the probation officer's view, Mr. Hoover's view himself, which is not necessarily controlling, he thought he was within Stubler's official duties. The case law is interesting here. I'm very familiar with Bivens' case law. It's a black and white thing. You're personal or you're official. In this area, is it the same? Perhaps I don't share the opinion of your adversary. He was strictly personal. But this statute has specific language about his duties, and your adversary is trying to cabinet to his official duties as opposed to the official duties of any federal officer. What should the rule be? I think it's greater in this particular area than it is in the civil context. And, again, you have to look at everything, all the important factors, including authority, the when, where, and the why. And, again, in Mr. Stubler's case, let me withdraw. In Mr. Hoover's case, there was no particular job description which required him to stay with past supervisees. However, again, I don't think it's disputed that when, in 2002, Mr. Stubler contacted Mr. Hoover about a past question of restitution, that would have still been within the official duties of Mr. Hoover. This is a slight variation on a theme. And, again, I think it's important that this matter was a federal matter in Mr. Stubler's somewhat convoluted mind. It involved supposedly the CIA and the FBI. Again, it would have been a different matter if Mr. Stubler came to Mr. Hoover and said, Look, I'd like to go to a gambling situation, but the Pennsylvania State Police are not allowing me to do that. Can you intervene? But, again, the subject matter of what Mr. Stubler brought to Mr. Hoover was certainly federal. And I think it's also in the undisputed facts that Mr. Stubler also had contacts with other individuals within the federal government. Unfortunately, due to his mental status, he was receiving Social Security checks on a monthly basis. He could have come into the Social Security office in the federal building in Williamsport instead of speaking to Mr. Hoover and asked that person. Again, it would be a less strong case if he had gone to Social Security and said, I'm having trouble with the FBI and the CIA. Can you help stop the surveillance? Was there any attempt to bring an involuntary civil commitment here? This case begs out for that. That's the appropriate way to handle this case. Was there any attempt at all to bring an involuntary civil commitment? At the time, events were occurring rather quickly. How quickly? What, he stabs a house? I assume the house is still going to be there the next day. No, no. He's not going anywhere. What's the rush? The most precipitating events occurred in June of 2006 when he was listing or putting up notices on the federal courthouse and office building when he was threatened to break it when he was confronted. Do you know how quickly you can move for an involuntary petition? It's incredibly quick. The law was written with that in mind because you don't want to have people on the street that are a danger to other individuals. So there's a mechanism in place to very quickly, as an awoke petition, can be done on a telephone. When I was a county state judge, you used to do these things at 2 o'clock in the morning with a telephone call. You authorize the person to be taken into custody. I think it's a 302 something or other. But you then file this involuntary petition, a petition for an involuntary commitment. And if you need a state statute, it seems to me this case is a perfect example, a textbook example, of a simple assault by physical menace. You're prosecuting for that, and the disposition is an involuntary civil commitment. And again, just to see the criminal justice system in three years in prison in a case like this, boy, we've really lost sight of what the purpose of these laws are, it seems to me. In terms of the three years commitment, I understand the court's position as is referenced in our brief. We were willing to recommend a year and a day for Mr. Stewart. You wanted time in, but you basically wanted to defeat the guy. The most important thing for Mr. Stewart's future is that he continue to take his medication, so we're not disagreeing. But your position was admirable. Once the criminal justice thing started, it wasn't that everyone was starting it. Now, I mean, you personally, because I don't know how many of these shots you were actually calling. But the position of the government here, once the criminal justice ball dropped, it seems to me it was perfectly appropriate, trying to get an appropriate disposition for Stewart. I don't know what happened with a very fine judge that he decided three years was appropriate as opposed to what you were recommending. Well, again, as the court indicated, sometimes the courts rely upon and utilize the sentencing guidelines, even though they're still advisory. And sometimes in a sentencing situation, reference to the two As and the four Bs and the five Cs and the five K2.0s, it helps to structure discretion. But I think the Supreme Court just two weeks ago told the courts, don't worry about it so much. It doesn't make a dime's worth of difference. I would ask one of my colleagues, I won't say which one here, whether or not you disagree. But I think you're right. This is an example of a sentence by guideline that doesn't make any sense, that was inconsistent with what the government was asking for, inconsistent with what was in the best interest of all concerned, including society as well as the defendant. But that's not really our concern. But nonetheless, I think it would be reasonable. It's not my perspective, not your perspective, Judge McKee, but Judge McClure is a seasoned sentencer, and he was using the guidelines and went through the correct procedures in terms of— Well, reasonableness would be our concern, if that was before us. That's not before us. If it were before us, that would be our concern. I share a lot of Judge McKee's concerns just expressed regarding the civil commitment, et cetera. But by the same token, Mr. Stubler had a prior record. This is not a first-time offender, and presumably the state was the one that dropped the ball here, right? If there's going to be a civil commitment, I'm not aware of the federal government initiating that. Am I wrong on that? There would be no involvement, and Mr. Stubler was on state probation for a good long period of time. At this time he was? No, not at this time. That's the problem. He was not on supervision either by the state or the federal government, and the only port in the storm, so to speak, that Mr. Stubler had was to go to Mr. Hoover. Again, that relationship seemed to be useful for Mr. Stubler in terms of keeping him out of harm's way and out of trouble. However, apparently there was too much stresses for Mr. Stubler in September of 2005 when he… Hoover can do a lot, but he can't get Bin Laden out of the guy's bed, and he can't solve the CIA-FBI conspiracy, right? That's correct, Judge. It seems to me that Hoover tried, and for reasons that we're not entirely sure about, Stubler unfortunately snapped. I agree completely that there should have been an involuntary civil commitment, but if the state doesn't do that, and this fellow is doing the kinds of things he's doing to the federal building and threatening, I guess perhaps I'm wondering what else the federal government was supposed to do other than just let him keep doing what he was doing, and that doesn't seem to be a viable option. Or they could try picking up the phone and calling the DA, because it happens all the time. Did that happen? As far as I know, that did not happen. And again, the DA would have been more motivated to proceed in the fashion that you, Judge Hardman, Judge McKee, suggested if the notes had been put on the Lycoming County District Attorney's Office or the Lycoming County Prison. That's where we've really gone crazy, I think, because to draw an impenetrable wall between state and federal rather than helping each other solve these problems, I completely agree with Judge McKee. To his credit, Hoover really acted as the textbook example of where a probation officer should do. Maintain contact with a guy, try to help him out, try to be somebody who could stand there to try to get him to do the right thing. Ended up in kind of a tragic situation. I think too, Judge, if you look at the FBI's actions in June of 2006, they were not out to hurry up and arrest Mr. Stubler either. They treated him not with kid gloves, but they certainly treated him with certain deference, and they were not looking to put Mr. Stubler away. They didn't even know until Mr. Stubler came with his notebook and said, Mel Hoover, knife, that the two situations were connected whatsoever. I just ask you to take back the notion that a mentally ill person commits a federal offense or does something to a federal building, that that means that the state can wash its hands of an involuntary commitment, I think is absurd, and I would hope that something like that doesn't happen again, because if the person's mentally ill, they need to be treated by the state system in the best fashion possible. Well, we had Mr. Stubler in 1993, and we had him in 2005 and 2006, and hopefully if it happens again, we will persuade the Lycoming County District Attorney's Office to intervene before we have to do anything about it. You know, I echo Judge Humisol. That's the only reason that I'm going off on my little tirade, because it's clearly not a legal inquiry, but I would hope that you would take the concerns of the court back to your supervisors and just try to, it seems to me, Mel, you said that you are incredibly sensitized to the concern here and the problem here. I'm not sure that the folks in your office who are calling the shots share those concerns or that sensitivity, but I hope that you would try to help them get to a reasonable point. Well, Mr. Travis and I have tried our best to work this out as amicably as possible with as short a sentence for Mr. Stubler as possible, and it became what it became, Judge. So it became a guideline sentence. Can I ask you a question? I'm not familiar with your courthouse or your federal building, but are all the agencies in there? Is the court, FBI, probation, they're all there in one place? Yes, it's not like Philadelphia, Your Honor. We have Social Security on the first floor and probation on the second floor. We have the FBI in the clerk's office. The third floor is our office, and the fourth floor is the court's. So we're an outpost, and we're all together. We used to be that way. It used to be like that. I remember coming to it in the early 80s as well, Your Honor, and it has changed. The man was thinking. If there are no other questions, thank you very much, Your Honor. Thank you, Mr. Martin. Mr. Travis, anything you want to add? You've got two minutes. Having well exceeded my 15 minutes the first time I was up here, the only thing I want to say is now that I think about it, I think I may have raised the question of the reasonableness of the sentence. All right. Well, you can resurrect that somehow. You may still lose, but let us know how it was resurrected, other than kind of reading the tea leaves. Maybe you can send us a 28-day letter and send a copy to Mr. Martin. I'll give that some thought on my way home. Conjure it up somehow. Let me just ask you one more question, Mr. Travis. Sure. Talking about the duties of the probation officer under Section 3603, it says the probation officer shall, but you haven't persuaded me that those are the exclusive duties. Where does it say you shall only? I guess I don't view that as an exhaustive list, and I'd like to give you an opportunity to persuade me why that's all that they are allowed to do, particularly when you've got approval of the supervisor. Well, on the approval of the supervisor, there's no question that Mr. Hoover indicated that he had talked to the supervisor and the supervisor said it was okay for him to maintain some sort of contact. I don't know, and it didn't go beyond that, I don't know exactly what the supervisor thought he was doing or told him he could do. But with respect to duties of a probation officer, when Congress enacts a statute that says these are the duties a probation officer has, it seems to me, from my view, my narrow view through reading, is to have an official duty to qualify for prosecution under Section 115, you have to be able to point to one of these specific duties as being implicated by what Mr. Hoover was doing. And if you can't point to one of these specific ten areas, it can't be an official duty. The fact that in the rejection of the Rule 29 argument, the judge concedes. Look, I initially said the motive was because Mr. Hoover did not inject himself into this surveillance situation that Mr. Stuber perceived. The defense is right. That is not an official duty. Could not be an official duty. But I'm going to amend what Congress said and I'm going to provide a more expansive definition of official duty in order to make what Mr. Hoover was doing fit within the parameters of what he was allowed by Congress to do. Let's say that in this circumstance, Mr. Hoover continues to have interaction with Mr. Stuber or someone else. Let's say that they decide, okay, we're going to lunch, which is something Mr. Stuber claimed happened, and Mr. Hoover said, I don't recall that. But let's say that Mr. Hoover said, get in my car, we're going to lunch, and there's an automobile accident. And now Mr. Stuber wants to sue the government because of the negligence of Mr. Hoover. I'd probably get run over by the assistant U.S. attorneys running in here arguing. There's no official duty there. He last had something to do with them eight and a half years ago. The fact that he chose to give them a ride to Wegmans for lunch, that's not an official duty. This is a tough case, and I understand where Judge McClure was trying to go. But when you look at what a probation officer is charged with having responsibility for, it's just not there. What Mr. Stuber did was terrible, and it was unsettling, and it was criminal. But it wasn't a violation of Section 115A2. There's terroristic threats in the state system. It's not a new rebuttal anymore. But we thank you both for your argument. Thank you. Thank you very much.